Jimmy SMITH, et al.,
Plaintiffs-Appellants,

v.

William F. WINTER, Governor of the State of Mississippi, Mike Carr, Chancellor, etc., et al., Defendants-Appellees.

No. 83–4250.

United States Court of Appeals,
Fifth Circuit.

Oct. 14, 1983.

**14.** *McChesney v. Henderson,* 482 F.2d 1101, 1106 (5th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974).

Everett T. Sanders, Port Gibson, Miss., for plaintiffs-appellants.

Ed Davis Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.

Before CLARK, Chief Judge, GEE and POLITZ, Circuit Judges.

CLARK, Chief Judge:

Three Black members of the Claiborne County, Mississippi Board of Education seek to remove to federal court a state hearing convened to determine whether there was cause to hold a public referendum on the issue of their recall from public office. Seeking removal via 28 U.S.C. § 1443, they allege that the application of the Mississippi recall statute violated their civil rights under the Voting Rights Act. The district court remanded for lack of federal jurisdiction. We affirm.

*Facts*

Petitions circulated among the electorate of Claiborne County demanded the recall of Jimmy Smith, Bennie Knox, and Roosevelt Yarbrough from their elected offices on the Claiborne County Board of Education. Pursuant to the Mississippi statutory recall procedure, set out in Mississippi Code Section 25, Chapter 5, the Registrar of Claiborne County examined and certified the signatures on the petitions. On January 26, 1983, the Registrar filed the certified petitions with Mississippi Governor William Winter, who issued executive orders granting the three board members until February 5, 1983, to submit sworn written evidence on the issue of whether the petition signatories were qualified electors of Claiborne County. On February 7, 1983, the Governor issued new orders extending this deadline until February 21, 1983. These new orders also asserted that the petitions contained, *prima facie,* sufficient qualified signatures to proceed with the recall procedures. Accordingly, Smith, Knox, and Yarbrough were notified that they should appear before a Removal Council at the Claiborne County Courthouse on February 28, 1983, to show cause why the issue of their recall from office should not be submitted to a county referendum. The Governor issued orders designating Chancery Judges Carr, Patterson, and Cortwright to compose the Removal Council.

On February 18, 1983, Smith, Knox, and Yarbrough submitted evidence that some 350 of the more than 2900 persons signing the petitions were not qualified electors. They allege that disqualification of even seventy signatures would invalidate the petitions.

On February 22, 1983, Governor Winter responded to these challenges by returning the petitions to the Claiborne County Registrar for re-examination. The Registrar certified the petitions once more and two days later returned them to the Governor. On February 24, 1983, the Governor issued executive orders declaring that, pursuant to his authority under Mississippi Code § 25–5–17 to make the final decision, he had found that the petitions contained sufficient valid signatures. He ordered the Removal Council hearing to proceed as scheduled.

On the morning of February 28, 1983, the day scheduled for the Removal Council hearing, Smith, Knox, and Yarbrough petitioned for removal of the recall proceedings to federal district court pursuant to 28 U.S.C. §§ 1441(c) and 1443. Named as respondents were Governor Winter and the three Chancery Judges composing the Removal Council. Upon notice of the petition for removal to district court, the Removal Council recessed its proceedings.

The district court heard oral arguments and remanded to the Removal Council on the basis of lack of federal jurisdiction. On March 28, 1983, Smith, Knox, and Yarbrough petitioned this court for a stay of the recall proceedings pending the appeal of the remand. The stay was denied, but the hearing of this appeal was expedited.

*Removal Pursuant to Section 1443*

A federal district court's order remanding an action to state court is not a final order and normally not appealable. *See Royal v. State Farm Fire & Casualty Co.,* 685 F.2d 124 (5th Cir.1982). Jurisdiction for this court to hear this appeal must

194

be found in 28 U.S.C. § 1447(d), which makes reviewable the remand of an action that involves civil rights issues within the ambit of § 1443.

Under 28 U.S.C. § 1443, a "defendant" may remove a civil action or criminal prosecution from state to federal court if he "is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States . . . ." This provision has consistently been construed narrowly to require strict satisfaction of both the "civil rights" element and the "enforcement" element intrinsic within it. The two-prong test has been stated as follows:

> First, it must appear that the right allegedly denied the removal petitioner arises under a federal law "providing for specific civil rights stated in terms of racial equality." . . . Second, it must appear, in accordance with the provisions of § 1443(1), that the removal petitioner is "denied or cannot enforce" the specific federal rights "in the courts of [the] State."

*Williams v. Mississippi,* 608 F.2d 1021, 1022 (5th Cir.1979), *cert. denied,* 449 U.S. 804, 101 S.Ct. 49, 66 L.Ed.2d 8 (1980), *quoting Johnson v. Mississippi,* 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975). *See also Georgia v. Rachel,* 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966); *City of Greenwood v. Peacock,* 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); *Texas v. Reimer,* 678 F.2d 1232, 1233 (5th Cir.1982).

Because the first prong of this test demands that the civil rights asserted arise under laws phrased specifically in terms of racial equality rather than in general terms of equality for all citizens comprehensively, broad first amendment or fourteenth amendment claims do not satisfy the test, nor do claims arising under non-racially oriented statutes such as 42 U.S.C. § 1983. *See Georgia v. Rachel,* 384 U.S. at 792, 86 S.Ct. at 1790; *Louisiana v. Rouselle,* 418 F.2d 873, 874 (5th Cir.1969). Because it confers rights specifically in terms of racial equality, the Voting Rights Act may sup-

port § 1443 removal. *Whatley v. City of Vidalia,* 399 F.2d 521 (5th Cir.1968).

In seeking to satisfy the first prong of the test, the plaintiffs have asserted rights arising from one specific alleged violation of 42 U.S.C. § 1973c and from other alleged infringements of their rights arising generally under 42 U.S.C. § 1973. Because we find that the allegations establish neither a violation of § 1973c nor any other claim cognizable under § 1973, removal under § 1443 must fail. Hence we do not address other questions that arise about the appropriateness of § 1443 removal in these peculiar circumstances. Specifically, we express no opinion on whether the Claiborne County Removal Council constitutes a "court" within the meaning of § 1443; whether the proceedings there constituted "civil actions or criminal prosecutions"; whether Smith, Knox and Yarbrough were in fact "defendants"; whether the "actions" brought against them were causally related to the exercise or enforcement of their civil rights, *see Perkins v. Mississippi,* 455 F.2d 7 (5th Cir.1972); or whether the plaintiffs would be unable adequately to enforce their rights in state courts. We assume, without deciding, that Smith, Knox, and Yarbrough have standing to assert these claims under the Voting Rights Act. *See City of Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980).

### The § 1973c Claim

The plaintiffs first allege a violation of 42 U.S.C. § 1973c. This section requires that those states to which it applies must seek federal preclearance or approval before effecting changes in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." The plaintiffs argue that Governor Winter deviated from the Mississippi statutory recall procedure when he returned the contested signatures to the Claiborne County Registrar for recertification and that this deviation constituted a change in voting practice or procedure without federal approval, in violation of § 1973c.

The Mississippi statutory recall procedure is set out in Miss.Code Ann. Sections 25–5–1 through 25–5–37 (1972). These statutes have been in effect in present form since 1956. They provide for the removal for cause of any elective county official under the following conditions. Thirty percent of the county electorate must demand the removal on petition, stating cause. § 25–5–7. Each petition must be verified by a qualified elector who states under oath that he or she has witnessed each signature and that to the best of his or her knowledge, each signatory is a qualified elector of the county. § 25–5–13. Before the petitions are presented to the governor, the county registrar must certify the petitions by comparing the signatures with the names of the qualified electors appearing on the county poll books, and must also certify the number of electors in the county as of the petition date. § 25–5–15. The registrar has a limited amount of time in which to complete this certification. § 25–5–19. The governor has the final decision about the validity of any signatures that are contested. § 25–5–17. Once the governor finds the petitions valid, the affected elected official is served notice of a hearing before a specially convened Removal Council at which he may show cause why the question of his removal should not be submitted to a vote of the county electorate. § 25–5–21. The governor appoints to the Removal Council three chancery judges, none of whom resides in the county in which the official under question resides. The Removal Council promulgates rules by which to conduct its hearings. § 25–5–23. If the Removal Council finds that sufficient cause has been shown to justify removal, then a special removal election is called. § 25–5–25. The officer in question remains in office pending the election results. § 25–5–27.

The plaintiffs contend that the Governor deviated from § 25–5–17 by returning the challenged signatures to the Claiborne County Registrar. Section 25–5–17 provides:

Such certificate by the county registrar shall be prima facie evidence of the facts stated therein and of the qualification of the electors whose signatures are thus certified. The governor shall consider and count only those signatures on such petition as shall be so certified by the registrar; provided, however, that any officer sought to be removed or any citizen of the county shall have the privilege of submitting evidence in writing, under oath, to the governor as to the question of whether or not any signator [sic] to the petition was in fact a qualified elector at the time of the signing of the petition, or has since died. The decision of the governor as to whether or not any particular person was or was not a qualified elector at the time of the signing of the petition, or whether or not any particular person has since died, shall be final and shall not be subject to review. The status of the signator as to whether or not he or she was a qualified elector at the time of signing the petition shall be determined as of the date of the petition and not by any other date.

We find that the Governor's action in returning the contested signatures to the Registrar was within the authority granted to him under § 25–5–17. The statute grants the Governor broad if not total discretion to weigh evidence regarding the validity of signatures. The Governor properly exercised that discretion in this instance by requesting the Registrar who had made the original certification to reconsider the petitions in the light of the specific objections raised. Two days later the Governor received the recertified petitions and reached his decision that the petitions were valid.

The plaintiffs for removal argue that when the petitions were returned to the Registrar, the statutory provision limiting the duration of the Registrar's certification process was violated.

The county registrar shall not retain in his possession any such petition or any section thereof for a longer period than two days for the first two hundred signatures thereon and one additional day for

each two hundred additional signatures or fraction thereof, and the time consumed in the examination of such petitions shall not be counted in determining the time between the signing and the filing of the petitions. At the expiration of the examination, the registrar shall forthwith file the same with the governor, with his certificate attached, and shall obtain a written receipt for the same.

Miss.Code Ann. § 25–5–19. These statutory time limits refer only to the period between the Registrar's receiving the petitions and his forwarding them to the Governor. The statute is silent about whether additional examinations may be requested after the Governor has received the petitions or what time limits might apply. The Governor is not precluded from returning petitions to the Registrar once he has received evidence that calls the certification into question. The statute does not require the Governor to act contemporaneously nor otherwise impose time limits on him in his decisionmaking nor on those upon whom he calls to assist in his decisionmaking. Returning the petitions to the Registrar involved only two days. That delay certainly cannot be viewed as an abrogation of the Governor's duty to act. The return did not constitute a departure from the statutory removal provisions.

Finding no "change" in the application of the Mississippi recall procedures in this instance we hold that the plaintiffs' allegations fail to establish a violation of 42 U.S.C. § 1973c, and hence fail to establish removal jurisdiction under 28 U.S.C. § 1443.

### Other Voting Rights Act Claims

The plaintiffs allege that three other activities also violated their rights under 42 U.S.C. § 1973. The first they assert is Governor Winter's issuance of executive orders convening the Removal Council after he had received evidence challenging the validity of signatures on the petitions. The second is the application of Miss.Code Ann. § 25–5–23,[1] "a statute unconstitutional on its face," whereby the Removal Council promulgated rules to regulate the conduct of its hearing. The plaintiffs assert that these two activities have the "effect and purpose of denying Appellants and other Black citizens of Claiborne County, Mississippi, the right to vote, the right to cast an effective ballot, the right to select the public officials of their choice, and denying Appellants the right to hold office after being duly elected, because of their race, color, or previous condition of servitude," in violation of § 1973. The third violation plaintiffs assert is that the Registrar, in tallying the number of qualified electors in the county for purposes of certifying the petitions, used voter registration books which had been illegally prepared by "transferring names from other registration books in violation of state statute and in violation [of] 42 U.S.C. § 1973 et seq."

1. Miss.Code Ann. § 25–5–23 states:

At the time and place designated in said notice, the governor shall cause to be convened a removal council to be composed of three chancery judges appointed by the governor, none of whom shall reside in the district in which the officer under question resides, to hear and determine whether there is substantial basis for a removal election consistently with the provisions of sections 25–5–3 to 25–5–37. The senior chancellor shall serve as the presiding judge of the council. The hearing herein provided may continue from day to day and be recessed from time to time, as in the discretion of the council may be ordered. The qualified electors of the county shall likewise be given notice by proclamation of the governor of the time and place of such hearing. Any interested citizen or citizens may likewise appear at said time and place and make such representations to the council as, in the discretion of the council, may be material to the issues involved. The council shall promulgate rules for such hearings, which shall be in writing, but all representations shall be made under oath, to be administered by some member of the council. It shall not be necessary that a stenographic record be kept of such representations, either for or against removal, but the testimony taken shall be heard as nearly as practicable in compliance with the usually applicable rules of evidence. All decisions of the council on any question, preliminary or final, including the question of whether just cause for an election has been shown, shall be final and not subject to review.

The elective officer concerned shall be entitled to be represented by counsel of his choice at said hearing.

Assuming without deciding that the plaintiffs have standing to enforce § 2 of the Voting Rights Act, *see City of Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980), we find that as a matter of law the plaintiffs have failed to state a claim cognizable under 42 U.S.C. § 1973. Section 1973(a) provides:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

42 U.S.C. § 1973(a) (1976), *amended by* Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 3(a), 96 Stat. 131, 134.

The various allegations of improper conduct in the application of the recall process might liberally be construed to implicate rights arising under § 1973 in two distinct ways—prospectively and retrospectively. Prospectively, voting rights might be implicated to the extent that the removal process itself constitutes a voting practice or procedure that has the potential to culminate in a special removal election. Retrospectively, the attacks might implicate those voting rights that already have been exercised in the election of the three board of education members who are the targets of the recall process. We examine the two possibilities in turn.

■ In regard to prospective voting rights violations, the plaintiffs have failed to state a claim cognizable under the Voting Rights Act. To establish such a claim, it is not sufficient to allege that a recall procedure constitutes a voting practice or procedure and that irregularities have transpired. It must also be established that there has been a denial or abridgement of the right to vote on account of race. The plaintiffs do not allege that the conduct complained of has the purpose or effect of denying or abridging minorities' rights to vote. They have not alleged that minorities will be denied access to the political processes that might eventuate in a special removal election. Nor have they alleged that the purpose or effect of the alleged illegal activities of the Registrar could be to deny or abridge minorities' voting rights in the special removal election or in other upcoming elections. Hence the plaintiffs have failed to state a claim under the Voting Rights Act as regards prospective voting rights. We do not intimate, however, that allegations of discriminatory misconduct of a recall process could never give rise to a claim under the Voting Rights Act.

Whether the plaintiffs have stated a claim in regard to voting rights that have already been exercised in the election of board of education members raises a more complex question. First we must consider the scope of the "right to vote" protected by the Voting Rights Act. It is a question that has seldom arisen in the case law. Typically, decisions arising under the Voting Rights Act have "involved actual restrictions on the franchise, either total exclusion of certain people as potential voters, requirements that had to be met before anyone could qualify as a voter, or limitations on who would be a voter in a particular election." Butler, *Constitutional and Statutory Challenges to Election Structures: Dilution and the Value of the Right to Vote,* 42 La.L.Rev. 881, 907 (1982). In cases such as these, the infringement of the right to vote has been so obvious as to moot the question of its scope. *Id.*

One of the rare types of voting rights decisions that have raised the question of the scope of the right to vote is the apportionment case. In that context, the Supreme Court has held that the right to vote was violated where a redistricting plan limited the access of minority members to the political process, even though such members were not denied suffrage.

The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*White v. Regester,* 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973).

■ This court has followed *White* in interpreting the right to an effective vote broadly as a right of meaningful access to the political process rather than narrowly as a mere right of registration and access to the ballot box. *See Kirksey v. Board of Supervisors,* 554 F.2d 139, 142 (5th Cir. 1977).[2] Even under these broad interpretations, the right to an "effective" vote refers to the citizen's right to make his voice heard in the electoral process, and not to the ability to command results in the public office. That is to say, a vote for a losing candidate is as "effective" as a vote for a winning candidate, if voting opportunities are equal. Moreover, a vote for a winning candidate is "effective" even though that candidate, after becoming an officeholder, might be consistently outvoted or otherwise rendered "ineffective" in pursuing announced goals of his or her campaign. These views accord with the principles that the right to vote does not entail the right to have a minority candidate elected, *see City of Mobile,* 446 U.S. at 65, 100 S.Ct. at 1498, nor a right to proportional representation, *see id.* at 75–6, 100 S.Ct. at 1504.

■ These interpretations have arisen specifically in the context of fifteenth amendment apportionment claims. But it is apparent that the "right to vote" means the same thing under the Voting Rights Act as under the fifteenth amendment. *See City of Mobile v. Bolden,* 446 U.S. at 61, 100 S.Ct. at 1496.[3] The eye of the problem is whether the right to vote entails not only a right for the citizen to make his voice heard in the electoral process, but the right as well to maintain his choice in the public office if successful. It is the latter, broader interpretation upon which the plaintiffs must necessarily rely when they allege that the recall process abridges minorities' rights to effective votes by threatening the removal of the officials for whom those votes were cast. Inherent in this expansive concept of the right to vote is a notion that each individual's vote represents a discrete quantum of political power that is traceable to the winning candidate and perpetuated there.

■ The plaintiffs point us to no authority or rationale to support this interpretation of the right to vote, and we find none. Rather, the cases noted evidence a telling silence. It seems clear, however, that if the right to vote stops short of the right to hold office, it necessarily also stops short of any absolute right to resist recall from office.

To adopt the plaintiffs' view of the right to vote poses unruly problems. For instance, how may we ever know whose effected right to vote any particular candidate embodies, so that we may know whose "vote effectiveness" is sought to be maintained? Given the sanctity of the secret ballot process in our Republic, individual votes cannot be traced from minority members' ballots into the public office. Not even postulates on which racial bloc voting calculations are based assume that all minority support was given to one public official, or provide anything more than a general measure of the degree to which that support is dispersed among public officials. Certainly they do not seek to establish that a particular public official is accountable to minority interests for any precise portion of his or her total political powers. It is as reasonable to assume that every elected official embodies the vote of at least some

---

**2.** A four-member plurality opinion of the Supreme Court has recently endorsed this narrow "registration and ballot box" interpretation of the right to vote in the context of voter dilution claims under the fifteenth amendment. *See City of Mobile v. Bolden,* 446 U.S. 55, 60, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980). There is lingering doubt, however, whether this narrow view is shared by a majority of the Court. *See Lodge v. Buxton,* 639 F.2d 1358 (5th Cir. 1981), *affirmed sub nom. Rogers v. Lodge,* 458

U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

**3.** The Court in *Mobile* found § 2 of the Voting Rights Act to be coterminous with the fifteenth amendment. Although the amendments made to § 2 subsequent to *Mobile* cast doubt upon the continued validity of that proposition, the amendments did not purport to alter the scope of the right to vote, only the showing required to prove discrimination.

minority member. If we followed the plaintiffs' view of the right to vote to its logical conclusion, every elected public official, whether a minority member or not, could seek removal to federal court of any state recall proceeding merely by alleging that the voting rights of an electorate containing at least one minority member were being discriminatorily abridged. Other absurd results are equally possible. For instance, if minority members vote for a candidate on the basis of a campaign promise and the candidate later breaches that promise with discriminatory effects, the minority voters could claim their rights to vote have been rendered ineffective so as to give rise to claims under the Voting Rights Act.

Obviously, the right to vote cannot be read so broadly. The Mississippi recall process does not threaten minority members' rights to an effective vote. Their rights to vote were consummated and made effective in the election. If the recall process, whether properly or improperly conducted, has the purpose or effect of discriminating against the plaintiffs, their appropriate remedy lies in making an equal protection claim, not a Voting Rights Act claim. An equal protection claim, because it does not arise under a law stated specifically in terms of racial equality, will not support § 1443 removal jurisdiction. Hence no appeal from the district court's order of remand on these grounds would be permitted.

This result does not take the plaintiffs by surprise. Smith, Knox, and Yarbrough have already instituted a companion federal action attacking the application of the recall process on fourteenth amendment grounds.

### Evidentiary Hearing

The plaintiffs argue that it was reversible error for the district court to deny them a full evidentiary hearing and limit them to oral arguments and presentation of evidence only by affidavit. Ordinarily, the district court must hold a full evidentiary hearing to determine whether the state actions brought against the plaintiffs were motivated by their exercise of rights

under the relevant civil rights statute. *See Wyche v. Hester,* 431 F.2d 791, 795 (5th Cir.1970). In this instance, however, we conclude that, as a matter of law, the plaintiffs have failed to state a claim cognizable under the Voting Rights Act, so that remand for an evidentiary hearing would be pointless.

### Conclusion

The district court's order remanding this action to the Removal Council of Claiborne County, Mississippi, is

AFFIRMED.