Michael V. ROBERTS, Appellee,

v.

Jerry B. WAMSER, Rita M. Krapf, Walter R. Wrenn, Jr. and David A. Robbins, Appellants,

Thomas A. Villa.

No. 88–1138.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 19, 1988.

Decided Aug. 21, 1989.

Rehearing and Rehearing En Banc Denied Nov. 14, 1989.

---

Leo Garvin, St. Louis, Mo., for appellants.

Michael A. Middleton, Columbia, Mo., for appellee.

Before BOWMAN and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.*

BOWMAN, Circuit Judge.

Appellants Wamser, Krapf, Robbins, and Wrenn (the "Board"), acting members of the Board of Election Commissioners of the City of St. Louis ("City"), appeal the District Court's determination that the Board's use of the punch-card voting system in City elections[1] violates Section 2 of the Voting Rights Act. The Board contends, among other things, that appellee Roberts, an unsuccessful candidate in the March 1987 Democratic primary for President of the Board of Aldermen, did not have standing to sue under the Voting Rights Act, 42 U.S.C. §§ 1973 *et seq.* We agree, and reverse.

## I.

Michael V. Roberts is a black citizen of the City of St. Louis, Missouri and was a major contender in the Democratic primary for President of the Board of Aldermen in March 1987. On February 27, 1987, four days prior to the primary election, Roberts brought suit in the District Court against the Board and George Peach, Circuit Attorney for the City.[2] In his complaint, Roberts alleged that certain actions of the Board constituted unfair help to an opposing candidate[3] and that the Board systematically removed blacks from the voter registration rolls in violation of 42 U.S.C. §§ 1981, 1983, 1985, and 1986, amendments I, V, and XIV of the federal constitution, and the federal Voting Rights Act. Roberts requested the Court to (1) enjoin the defendants from interfering with or intimidating the plaintiffs and black citizens; (2) enjoin the defendants from contributing to or doing commercials for white candidates; and (3) grant punitive damages of $150,-000.[4] On the morning of the primary election, Roberts requested the appointment of federal marshals to ensure the integrity of the election. This relief was denied by the District Court.

Roberts lost the primary by 171 votes. A total of 77,444 votes were cast. The following day, the Board certified the results and announced Thomas A. Villa the winner.[5] Missouri law provides a candidate the opportunity to contest an election result. Mo.Rev.Stat. §§ 115.526 *et seq.* (1986).[6] Missouri state courts are autho-

---

* The Honorable Gerald W. Heaney assumed senior status on December 31, 1988.

1. The punch-card voting system replaced the lever-type voting machines in 1981 in the City of St. Louis. The punch-card system requires a voter to push a pointed metal device (stylus) through the ballot card in a designated spot.

2. Roberts was joined in this original complaint by Rev. James DeClue in his capacity as President of the St. Louis branch of the NAACP.

3. Roberts's grievance stemmed primarily from the alleged actions of Wamser and Peach. Roberts specifically alleged that Wamser and Peach 1) contributed money and support to Roberts's white opponent; 2) publicly endorsed and starred in campaign commercials for Roberts's white opponent; 3) failed to deputize Rev. James DeClue as a volunteer registrar while allowing the nearly all-white League of Women Voters to serve in the same capacity; 4) acted so as to cause the political defeat, humiliation, loss of reputation, and mental distress of Roberts; 5) conspired to harm and deprive Roberts of his

rights; and 6) intimidated and harassed black voters by making surprise visits to predominately black polling places.

4. No mention was made in the original complaint of any irregularities with the punch-card voting system.

5. Villa won the April 7, 1987 general municipal election and presently holds the office of President of the Board of Aldermen. Although Villa was granted leave to intervene as a defendant on April 2, 1987, he does not join the Board in this appeal.

6. Roberts availed himself of the state election contest procedures after his bid for the same position in 1983. In the March 1983 Democratic primary for President of the Board of Aldermen, Thomas Zych defeated Roberts by approximately 750 votes. Roberts timely filed an election contest in state circuit court pursuant to Mo.Rev.Stat. § 115.526. Roberts alleged, among other things, that a large number of ballots had not been counted because undervot-

rized to conduct recounts and determine the validity of ballots. Mo.Rev.Stat. §§ 115.539–115.545.

Even though Roberts lost by less than one percent of the total votes cast, entitling him to a recount, *see* Mo.Rev.Stat. § 115.601, he did not avail himself of the Missouri election contest procedures. Instead, Roberts filed in the District Court on March 9, 1987 the first of four amendments to his original complaint.[7] In this First Amended Complaint, Roberts reiterated his previous allegations and requested the court to (1) manually recount, under the supervision of federal marshals, all ballots cast; (2) render the primary election null and void; and (3) prohibit the general election. His complaint also requested the court to exercise pendent jurisdiction over his claim for a recount pursuant to state law. The District Court declined to exercise pendent jurisdiction.

The Second Amended Complaint mirrored the first except that Roberts abandoned his claim for a recount pursuant to state law. In his Third Amended Complaint, Roberts was joined by three members of the St. Louis branch of the NAACP. It is in this amended complaint that Roberts first implicates the use of the punch-card voting system, claiming that a disproportionate number of black voters' ballots were not counted by the tabulating machines.

On April 9, 1987, the District Court ordered a manual recount for specific wards.[8] After the results of the recount showed a decrease in the margin of Villa's victory, the court ordered a recount for the remaining wards. Ballots not counted by the tabulating machines were examined by a three-member panel consisting of one member selected by Roberts, one member selected by Villa, and a third member appointed by the District Court upon the failure of Roberts's and Villa's representatives to agree on the third member. While the panel disagreed on the precise results of the recount, "it is clear that Roberts would have lost the election by no less than sixty votes even under the most favorable rules applied, either unanimously or by majority vote of the panel." *Roberts v. Wamser*, 679 F.Supp. 1513, 1516 (E.D.Mo.1987).

On June 26, 1987, Roberts, acting alone,[9] filed a Fourth Amended Complaint in which he deleted most of his earlier allegations. In this final amended complaint, Roberts alleged that the Board's use of the punch-card voting system resulted in the failure to count a disproportionate number of ballots cast by black voters.[10] Roberts asserted that as a direct result of the Board's failure to count these ballots:

> [S]everal hundred or thousands of black citizens of the City of St. Louis who desired to cast their ballots for plaintiff Michael V. Roberts … were denied equal opportunity to participate in the electorial [sic] process, and to elect the candidate of their choice in that their ballots cast were not counted, and plaintiff Michael V. Roberts was denied the

ing and overvoting had occurred. *See supra* note 10. Roberts was not awarded a new election, but a recount was agreed to by the parties. The recount eventually widened Roberts's margin of defeat.

**7.** Defendant Peach was dismissed by Roberts on March 6, 1987.

**8.** The recount was ordered for wards 1, 12, 13, 15, 16, 20, and 22.

**9.** The other plaintiffs were dismissed by the District Court for failure to file pretrial materials. *Roberts v. Wamser*, No. 87–0347C(3), slip op. at 1 (E.D.Mo. June 22, 1987) (order dismissing certain plaintiffs). Roberts was granted leave to file a final amended complaint "on his

behalf only." *Roberts v. Wamser*, No. 87–0347C(3), slip op. at 1 (E.D.Mo. June 26, 1987) (order granting Roberts leave to amend).

**10.** The punch-card tabulation machines do not count "overvotes" and "undervotes." The tabulation is done by a computer that reads the ballot cards by passing a beam of light over the card. If there is no hole in the card (undervote), the machine cannot count a vote. If there are two holes punched in an election that allows only one selection (overvote), the computer will disregard both votes. In the 1987 Democratic primary for President of the Board of Aldermen, there was a total of 2,864 ballots cast in which a vote for any particular candidate was uncounted because of undervoting or overvoting.

electoral victory which was rightfully his. . . .

Designated Record at 360.

Roberts requested a manual recount and a declaration of the "true winner" of the primary election. Roberts also requested the court to permanently enjoin the Board from utilizing any practices or procedures that deny black citizens equal access to any phase of the electoral process. Roberts brought this action under § 1983, alleging violations of the Fourteenth and Fifteenth Amendments, and under the Voting Rights Act.

Before the start of trial, the District Court dismissed Roberts's § 1983 claims, leaving only the claim under the Voting Rights Act. After a three-day bench trial, the District Court concluded that the Board's use of the punch-card voting system and failure to manually review rejected ballots constituted a violation of § 2 of the Voting Rights Act. Relying on the Supreme Court's analysis in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the court found that the use of the punch-card voting system in St. Louis denies blacks an equal opportunity with whites to participate in the political process and to elect candidates of their choice. *Roberts*, 679 F.Supp. at 1532.

Although the court found a Voting Rights Act violation, it concluded that the violation did not result in Roberts's defeat and thus denied the relief requested by Roberts. However, the court did order the Board to (1) manually count all ballots validly cast but rejected by the tabulating equipment in future elections; (2) target voter education on the use of punch-card voting in those wards that have a high number of uncounted ballots; and (3) offer explanations and demonstrations of the proper use of the punch-card voting system to all voters. *Id.* at 1532.

On appeal, the Board challenges the District Court's decision on ten different grounds, but the Board's disagreement with the decision boils down to three main arguments: (1) Roberts was improperly granted standing to contest the election results under the federal Voting Rights Act; (2) the District Court erred in finding a Voting Rights Act violation from the evidence presented at trial; and (3) the District Court erred in failing to apply the standard of proof required under *Thornburg*. We reverse on the ground that Roberts lacks standing to sue under the Voting Rights Act.

## II.

Standing is a threshold question in every case before a federal court. In *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), the Supreme Court counseled appellate courts to scrutinize cases for jurisdictional defects: "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]'" *Id.* at 541, 106 S.Ct. at 1331 (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)); *see also Coalition for the Environment v. Volpe*, 504 F.2d 156, 168 (8th Cir.1974) (standing is a "threshold inquiry" that "eschews evaluation of the merits").

A federal court must ask "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (footnote omitted). In the present context, the precise issue is whether the Voting Rights Act can properly be understood as granting an unsuccessful candidate the right to maintain a judicial challenge to allegedly discriminatory voting procedures that allegedly caused him to lose the election.[11]

---

**11.** Whether Roberts, who sues as a frustrated candidate, has standing under the Voting Rights Act to bring this challenge to punch-card voting is a question of first impression. The case the District Court relied on to find standing, *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F.Supp. 240 (S.D.Miss.1985), is not directly on point because the case involved one plaintiff whose right to vote allegedly had been infringed. Moreover, the district judge in *Goodloe* never addressed the standing issue.

Originally, the Voting Rights Act expressly conferred standing only upon the Attorney General. However, in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Supreme Court recognized that a private litigant attempting to protect his right to vote was a proper party to effectuate the goals of the Act, and therefore granted standing to aggrieved voters "seek[ing] judicial enforcement of the prohibition" against the infringement of the right to vote on account of race. *Id.* at 557, 89 S.Ct. at 827. In recognition of the Supreme Court's holding in *Allen*, Congress amended the Voting Rights Act in 1975 to reflect the standing of "aggrieved persons" to enforce their right to vote.[12]

Here, Roberts is not an aggrieved voter suing to protect his right to vote. Nowhere in his complaint (or anywhere else) does Roberts claim that his right to vote has been infringed because of his race. Nor does Roberts allege that he is suing on behalf of persons who are unable to protect their own rights. The asserted personal injury for which Roberts seeks a remedy is not the denial of his right to vote, but rather the loss of the votes that he claims he would have received if not for the allegedly disproportionate difficulties of black voters in coping with punch-card voting.[13] Because Roberts is not seeking to enforce his right to vote, but rather to improve the odds of his being elected, the question becomes whether he is an "aggrieved person"

within the meaning of the Voting Rights Act.

We conclude that an unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act. Although the "aggrieved person" language might be stretched to include an unsuccessful candidate such as Roberts, we are unconvinced that Congress intended it to be stretched that far. The purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections. In addition, we see good reasons why Congress would not have wished to confer standing on defeated candidates. First, because of the potential divergence between the interests of a candidate seeking office and citizens attempting to enforce their right to vote, it is difficult to see an aggrieved candidate as being a proper party to bring a Voting Rights Act action. And second, because state and local election contests are quintessential state and local matters, to extend standing to an unsuccessful candidate to challenge his electoral defeat under the Voting Rights Act would violate principles of federalism in a highly radical way—an intention that we should not attribute to Congress except upon its unmistakably clear manifestation in the statutory language.

In other cases, suits brought by unsuccessful candidates have been dismissed for failure to state a claim without discussion of the standing issue. *See McGruder v. Phillips County Election Commission*, 850 F.2d 406 (8th Cir.1988) (court upheld dismissal of candidate's Voting Rights Act action for failure to allege facts constituting a violation without addressing standing issue); *Smith v. Winter*, 717 F.2d 191, 194 (5th Cir. 1983) (court found that members of a county board failed to state a cause of action under the Voting Rights Act, stating: "We assume, without deciding, that [the board members] have standing to assert these claims under the Voting Rights Act."); *Brown v. Schweitzer*, 596 F.Supp. 935, 938 (E.D.Mo.1984) (court dismissed action by a candidate for sheriff for failure to state a claim upon which relief could be granted because the practices complained of "do not affect plaintiff's right to vote").

**12.** Section 3, entitled "Proceeding to enforce right to vote" reads: "(a) Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendments in any State or political subdivision the court shall authorize the appointment of Federal examiners...." 42 U.S.C. § 1973a.

**13.** The District Court, in finding that Roberts had standing, similarly recognized that Roberts's injury was the loss of the election because of punch-card voting rather than the denial of his right to vote. The court found that Roberts "allegedly suffered a distinct and palpable injury, the loss of an election, through the contested practice(s) at issue here and the alleged denial to black voters of an equal opportunity to participate in the political process." *Roberts*, 679 F.Supp. at 1528.

## A.

The possible divergence of interests between a candidate seeking office and a citizen attempting to protect his right to vote underscores the dubious nature of Roberts's claim to standing under the Voting Rights Act. The history of this litigation exhibits that Roberts's primary concern was in getting elected, and that whatever displeasure he might have regarding election procedures originates from that concern.[14] By contrast, an aggrieved voter is not concerned about getting elected, but with his right, and the right of others similarly situated, to vote. It is quite conceivable that a candidate hoping to be elected would concede certain issues that an aggrieved voter would not. Similarly, a candidate may decide to settle or dismiss a suit when an aggrieved voter would pursue the case to its conclusion.[15] Where, as here, the question is whether a particular plaintiff has standing to sue under a particular statute, the standing doctrine, properly applied, serves to protect the legal rights of those persons intended to be protected by the statute. Although it is true that here the ultimate relief granted by the District Court may serve the interests of the voters, standing is a threshold question, as noted earlier, and must be determined before the court proceeds to the merits of a case.

## B.

The essence of Roberts's claim is that certain ballot casting, handling, and counting procedures utilized by the Board resulted in the failure to count some ballots. Roberts requested a federal district court to determine the validity of ballots cast in a local primary. The issue of the validity or invalidity of a ballot or ballot procedures is a question of state law. *See Partido Nuevo Progresista v. Perez,* 639 F.2d 825 (1st Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981); *Hubbard v. Ammerman,* 465 F.2d 1169 (5th Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973). The "power to control the disposition of contests over elections to ... state and local offices" is conferred by the Constitution on the states. *Id.* at 1176.

Pursuant to Missouri law, "any candidate ... may challenge the correctness of the returns [of an election] ... charging that irregularities occurred in the election." Mo.Rev.Stat. § 115.527 (1986). Missouri law provides an elaborate system to deal with a candidate's challenge to an election outcome. The state circuit courts are given jurisdiction (§ 115.529) to hear election contests and are authorized to review ballots to determine their legality (§§ 115.541). An aggrieved candidate may designate one of his representatives to participate in the recount (§ 115.543). Any determination by a state circuit court is appealable (§ 115.-551). And a candidate losing by less than one percent of the total vote is entitled to a recount (§ 115.601). In the present case, Roberts bypassed the Missouri election contest procedures and instead used the Voting Rights Act to entangle the federal judiciary in his personal quest for city office.

We believe that our consideration of doubtful questions of standing to sue under the Voting Rights Act (or any other federal law that treads upon important interests of state and local governments) should be guided by a decent regard for the nature of our federal system. Where Congress acts in a field that is within its constitutional competence, but has not clearly spoken, a federal court should construe the congressional enactment in a manner that recognizes and preserves a healthy balance between state and national power. A concern for federalism cautions against the excessive entanglement of fed-

---

14. We note that Roberts's original complaint, filed prior to the election primary, did not even contain a claim challenging the Board's use of punch-card voting, even though, as is evident from his 1983 state court action, Roberts had long had knowledge of the alleged difficulties of the punch-card voting system.

15. Because of the potential conflict of interests, we doubt that Roberts could have been certified as a class representative under Fed.R.Civ.P. 23(a), which requires that the class representative fairly and adequately represent the interests of the group.

eral courts in state election contests. *See Kasper v. Bd. of Election Comm'rs of City of Chicago,* 814 F.2d 332 (7th Cir. 1987); *Pettengill v. Putnam County R–1 School Dist.,* 472 F.2d 121 (8th Cir.1973).[16] If disappointed candidates for state office were allowed to use the Voting Rights Act to challenge the outcome of elections, "federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded." *Gamza v. Aquirre,* 619 F.2d 449, 453 (5th Cir.1980); *see also Grimes v. Smith,* 776 F.2d 1359, 1367 (7th Cir.1985) (monitoring the conduct of elections "is a role that the federal judiciary should not be quick to assume"). The denial of Voting Rights Act standing to unsuccessful candidates helps to maintain the fragile relationship between federal and state power and allows state election complaints brought by unsuccessful candidates to be addressed under state laws designed specifically to deal with such complaints.

We also observe that Roberts's claim to standing in this case is not dependent upon his being a member of a minority group protected by the Voting Rights Act, but rather on his simply being a candidate for public office. Under Roberts's (and the District Court's) theory of standing, any candidate, without regard to his or her race, could challenge an election result by alleging that something about the manner in which the election was conducted infringed upon the voting rights of blacks or other protected groups. If such a theory of standing were accepted, the potential Voting Rights Act challenges to state elections by losing candidates would be endless. We cannot believe that Congress intended such a result. More importantly, we cannot find anything in the language of the Voting Rights Act that makes manifest a congressional intent to bring about such a counterintuitive result.

As already indicated, our decision does not leave losing candidates without a remedy. Every state provides procedures for election challenges, *see generally,* Federal Election Commission, Contested Elections and Recounts, Vols. II & III (1978), and as Roberts asserts in his brief to this Court, "[l]ong before our electoral system was enhanced by the Voting Rights Act, the standing of unsuccessful candidates to contest elections [under state procedures] was beyond serious dispute." Brief for Appellee at 14 (citing eight state court decisions). Here, the Missouri election contest procedures, not available to aggrieved voters, provide candidates an avenue for redress.[17] In addition, a candidate who alleges that state officials have discriminated against him on account of his race can bring suit under § 1983 and the Fourteenth Amendment. *See Smith v. Cherry,* 489 F.2d 1098 (7th Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (under § 1983, plaintiff must prove intentional or purposeful discrimination by defendant). We conclude that Roberts, as a defeated candidate, does not have standing to sue under the Voting Rights Act.

---

**16.** The spectre of excessive entanglement by a federal court in state election contests is illustrated by this case. Here, the District Court appointed a three-member panel (one member selected by each of the candidates and one member selected by the court) to determine the validity of ballots that had been cast but that the tabulating machines were unable to count. No reason appears why Roberts could not have obtained a proper recount, and any other appropriate relief, under state law.

**17.** The Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), stated that one of the factors to consider in determining whether a private remedy is implicit in a statute is whether "the cause of action [is] one traditionally relegated to state law ... so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78, 95 S.Ct. at 2087. Although the continued validity of the *Cort* analysis for determining the existence of private rights of action is questionable, *see Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 520–22, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring), this Court finds persuasive the fact that every state has procedures for defeated candidates to use in challenging elections. This fact further convinces us that Congress did not intend to displace established state election contest procedures by allowing defeated candidates to use the Voting Rights Act to bring state election contests into the federal courts.

## III.

The right to vote is fundamental to our system of government. Allegations by voters that their right to vote has been unlawfully denied or impaired must be considered with the utmost care. Although the Voting Rights Act is a powerful tool for eradicating racial discrimination as a barrier to equal voting rights for all citizens, standing to sue under this Act is limited to the Attorney General and to "aggrieved persons," a category that we hold to be limited to persons whose voting rights have been denied or impaired. A defeated candidate, whose goal is to change the outcome of the election, is not a proper party to assert claims under the Voting Rights Act.

Because of our conclusion that Roberts lacks standing to bring this action under the Voting Rights Act, the judgment of the District Court is reversed.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent. Today, the majority resolves the question presented—whether Roberts has standing to claim a violation of section 2 of the Voting Rights Act—through an artifice of statutory interpretation. It holds that Congress did not intend to intercede into state and local elections. I disagree. The Voting Rights Act of 1965 was intended to enforce the Civil War amendments, particularly the 15th amendment, as against state election laws to the contrary. The House Report to the 1965 Act stated the following:

### PURPOSE OF THE LEGISLATION

The bill, as amended, is designed primarily to enforce the 15th amendment to the Constitution of the United States and is also designed to enforce the 14th amendment and article I, section 4. To accomplish this objective, the bill (1) suspends the use of literacy and other tests and devices in areas where there is reason to believe that such tests and devices have been and are being used to deny the right to vote on account of race or color;

(2) authorizes the appointment of Federal examiners in such areas to register persons who are qualified under State law, except insofar as such law is suspended by this act, to vote in State, local and Federal elections; (3) empowers the Federal courts, in any action instituted by the Attorney General, to enforce the guarantees of the 15th amendment, to authorize the appointment of Federal examiners, pending final determination of the suit or after a final judgment in which the court finds that violations of the 15th amendment have occurred; (4) provides criminal penalties for intimidating, threatening, or coercing any person for voting or attempting to vote, or for urging or aiding any person to vote or to attempt to vote. In addition, civil remedies and criminal remedies are provided for the enforcement of the act.

H.R.Rep. No. 439, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.CODE CONG. & ADMIN.NEWS 2437, 2437.

In light of the general purpose of the Act, I believe that Roberts has standing because he was both a voter and a candidate for elected office. Moreover, upon reaching the merits, I would affirm the district court.

## I. STANDING

### A. AS A VOTER

Regardless of whether a candidate for office has standing to sue under the Voting Rights Act, a voter does have standing. To establish standing pursuant to Article III of the Constitution, Roberts must show a distinct and palpable injury to himself caused by the challenged actions of the defendants. *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

The trial court made the following finding of fact: "Plaintiff, Michael V. Roberts, is a black citizen of the United States of America, and a resident and registered voter of the City of St. Louis, Missouri." *Roberts v. Wamser*, 679 F.Supp. 1513, 1514 (E.D.Mo.1987).[1]

---

1. The trial court, however, did not rely on this fact when it concluded that Roberts had stand-

Roberts, as a voter, suffered a distinct and palpable injury. His right to vote, as a black citizen of the City of St. Louis, was allegedly infringed upon by racial discrimination. He thereby was denied equal opportunity to participate in the political process. The failure to manually recount those ballots rejected by the punch card tabulating system caused Roberts, as a black voter, to have less opportunity than other members of the City's electorate to participate in the political process and to elect representatives of their choice. *Roberts*, 679 F.Supp. at 1532.[2]

In addition to the Article III limitation on standing requiring injury in fact, a plaintiff who invokes a statutory provision must be arguably within the zone of interests or persons the provision was intended to safeguard. *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In recognizing this further limitation, the Supreme Court has adopted a self-imposed rule of restraint to allay any fears that the Judicial Branch is overstepping its authority, thereby recognizing a separation of powers between the Legislative and Judicial Branches of the federal government. *Id.* at 154, 90 S.Ct. at 830.

The predominant goal of the Voting Rights Act is to achieve fuller enforcement of the 15th amendment, and that goal is forwarded by granting voters standing to sue. "It is consistent with the broad purpose of the Act to allow the individual citizen standing . . . ." *Allen v. State Board of Elections*, 393 U.S. 544, 557, 89 S.Ct. 817, 827, 22 L.Ed.2d 1 (1969). The language of section 1973a was amended in 1975 to grant "aggrieved persons" remedies under the Act. Voting Rights Act of 1965—Extension, Pub.L. No. 94–73, § 401, 89 Stat. 400 (1975); S.Rep. No. 295, 94th Cong., 1st Sess., 39–40, *reprinted in* 1975 U.S.CODE CONG. & ADMIN.NEWS 774, 806. Roberts, as a voter, is an "aggrieved person" for purposes of the Voting Rights Act. Therefore, Roberts, as a voter, has standing to sue for a violation of the Voting Rights Act.

## B. AS A CANDIDATE FOR ELECTED OFFICE

The majority concluded "that Roberts, as a defeated candidate, does not have standing to sue under the Voting Rights Act." *Ante*, at 624. I disagree.

Initially, I note that Roberts, as a defeated candidate, meets the Article III requirement for standing of injury in fact. Roberts alleges that he lost the election for President of the Board of Aldermen for the City of St. Louis. This is a direct and palpable injury.[3] *See Schiaffo v. Helstoski*, 492 F.2d 413, 423 (3d Cir.1974) (Schiaffo, as an electoral opponent of Helstoski and a member of an opposition political party within Helstoski's district, claimed

ing. Rather, it cited *Goodloe v. Madison County Bd. of Election Com'rs*, 610 F.Supp. 240 (S.D. Miss.1985) for the proposition that Voting Rights Act lawsuits can be brought by unsuccessful candidates.

2. Roberts' Voting Rights Act injury, as a voter, is redressable by the federal courts. Available remedies that would benefit Roberts as a voter include, but are not limited to, a manual recount of all ballots rejected by the tabulating machine, increased voter education in those wards where a high number of ballots are rejected, and increased instruction at the polling place.

3. The injury requirement for standing need not be injury in fact. In other words, Roberts does not necessarily have to allege for standing purposes that he would have won the election in question. Roberts lost the opportunity to participate in an election where the right to vote was not abridged by racial discrimination, and

loss of opportunity is sufficient injury for standing purposes. *See, e.g. Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) (State of California had standing to assert that the Secretary of the Interior had failed to obey a statutory command to experiment with certain procedures even though the State might receive no benefit at all); *University of California v. Bakke*, 438 U.S. 265, 280 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (non-minority applicant had standing because he was denied the opportunity to compete for all the places in the class even though he had not shown that he would have been admitted but for the preference extended to minority applicants). This is not the case where standing should be denied because plaintiff could not receive any plausible benefit. *Henson v. University of Arkansas*, 519 F.2d 576 (8th Cir.1975).

some direct injury as a result of Helstoski's alleged illegal act and does not suffer in some indefinite way in common with people generally). He alleges that this injury was caused in some "concretely demonstrable way" by the punch card voting system in violation of the Voting Rights Act.[4] Thus, Roberts, as a candidate, has standing under Article III. *See Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir.1973) ("[W]e believe that both candidates and voters may challenge on its face on equal protection grounds a candidacy restriction because of its impact on voting rights.").

As to the zone of interests test for standing, the majority apparently concludes that Roberts, as a candidate, is not a member of the group sought to be protected or benefitted by the Voting Rights Act. In other words, the majority concludes that Congress did not intend the term "aggrieved person" found in 42 U.S.C. 1973a to include a candidate for elected office. *Ante*, at 621. I disagree.

The Act as originally enacted only afforded the Attorney General remedies for violations of section 2. In 1975, Congress amended the Act to allow "aggrieved persons" the same remedies afforded previously to the Attorney General.[5] Voting Rights Act of 1965—Extension, Pub.L. No. 94–73, § 401, 89 Stat. 400 (1975); S.Rep. No. 295, 94th Cong., 1st Sess., 39–40, *reprinted in* 1975 U.S.CODE CONG. & AD-MIN.NEWS 774, 806. In the Senate Report accompanying the 1975 Amendment, Congress clearly stated what it meant by "aggrieved person."

An "aggrieved person" is *any person* injured by an act of discrimination. It may be an individual or an organization representing the interests of injured persons. *See Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 [93 S.Ct. 364, 34 L.Ed.2d 415] (1972); and *NAACP v. Button*, 371 U.S. 415 [83 S.Ct. 328, 9 L.Ed.2d 405] (1963). In enacting remedial legislation, Congress has regularly established a dual enforcement mechanism. It has, on the one hand, given enforcement responsibility to a governmental agency, and on the other, has also provided remedies to private persons acting as a class or on their own behalf. The Committee concludes that it is sound policy to authorize private remedies to assist the process of enforcing voting rights.

S.Rep. No. 295, 94th Cong., 1st Sess., 40, *reprinted in* 1975 U.S.CODE CONG. & ADMIN.NEWS 774, 806–807 (emphasis added). Thus, if a person meets the Article III requirements for standing, that person is an "aggrieved person" under § 1973a and has standing to sue for violations of the Voting Rights Act.[6]

The majority ignores Congress' clear expression of intent and denies standing, regardless of injury to Roberts, because of a possible divergence of interests between a candidate and a voter and because federalism mandates unmistakenly clear statutory language. I feel, however, that in this instance neither rationale is a formidable obstacle to Roberts' standing as a candidate.

First, the majority's discussion of a possible divergence of interests between a candidate and a citizen seeking to protect his or her right to vote incorrectly narrows the aim of the Act to only the enforcement of

---

**4.** Roberts' Voting Rights Act injury, as a candidate, is also redressable by the federal courts. Roberts would personally benefit from an injunction requiring a manual recount and a second general election if Roberts is declared the winner of the Democratic primary.

**5.** "Aggrieved person" is a popular term of art in legislative construction. *See, e.g.*, 29 U.S.C. § 626 (Age Discrimination in Employment); 29 U.S.C. § 1854 (Agricultural Worker Protection); 42 U.S.C. § 3613 (Fair Housing).

**6.** Enforcing Congress' grant of standing to candidates injured by Voting Rights Act violations becomes exceedingly important when the Executive Branch is indifferent to, or even benefits from, such violations. "The polarizing philosophy of the Reagan years affected more than the Administration's enforcement activities. Its legacy, engrafted upon Reconstruction era stereotypes about black officials, has perpetuated and accentuated a racially skewed reality in which blacks vote but do not govern, at least not in majority white jurisdictions." Guinier, *Keeping the Faith: Black Voters in the Post–Reagan Era*, 24 Harv.C.R.–C.L.L.Rev. 393, 414 (1989). ˜

the 15th amendment. From the beginning, the Voting Rights Act has embraced broader considerations. Guaranteeing the opportunity to participate in the electoral process is implicit in the Act's directive to enforce the 14th amendment and article I, section 4, of the Constitution, as well as the 15th amendment. H.R.Rep. No. 439, 89th Cong., 1st Sess., *reprinted in,* 1965 U.S. CODE CONG. & ADMIN.NEWS 2437, 2437. Moreover, the Act was renewed and amended in 1982 to cover a broad array of dilution schemes employed to cancel the impact of the new black vote. S.Rep. No. 417, 97th Cong., 2d Sess., 4–9, 1982 U.S. Code Cong. & Admin.News, pp. 177, 180–186. Congress added subsection (b) to section 1973. It reads in part:

A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate *to participate in the political process* and to elect representatives of their choice.

As amended Pub.L. 97–205, § 3, 96 Stat. 134 (1982) (emphasis added). While this subsection was specifically addressed at overruling *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), I also believe that the language is plain evidence of Congress' intent to protect more than just the right to vote. Congress intended to assure that the "members of the protected class have the same opportunity as others to participate in the electoral process." S.Rep. No. 417, 97th Cong., 2d Sess., 67, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 177, 246. Thus, the Voting Rights Act protects both voters' and candidates' interests.[7]

The second premise the majority relies upon to deny candidates standing under the Act is federalism.

We believe that our consideration of doubtful questions of standing to sue under the Voting Rights Act (or any other federal law that treads upon important interests of state and local governments) should be guided by a decent regard for the nature of our federal system. Where Congress acts in a field that is within its constitutional competence, but has not clearly spoken, a federal court should construe the congressional enactment in a manner that recognizes and preserves a healthy balance between state and national power.... The denial of Voting Rights Act standing to unsuccessful candidates helps maintain the fragile relationship between federal and state power and allows state election complaints brought by unsuccessful candidates to be addressed under state laws designed specifically to deal with such complaints.

*Ante,* at 623–624. The majority's reasoning, however, overlooks the realities of the Voting Rights Act.

By enacting the Voting Rights Act, Congress intended to intercede in the operation of elections by state and local officials. The Act provides federal remedies to enforce the promises of the 14th and 15th amendments to, and Article I, Section 4, of, the Constitution because the Congress in 1965—as well as the Congress in 1970, 1975 and 1982—did not trust the states to remedy racial discrimination within the electoral process. The House Report to the 1965 Act states:

What has been the effect of the 1957, 1960, and 1964 voting rights statutes? Although these laws were intended to supply strong and effective remedies, their enforcement has encountered serious obstacles in various regions of the country. Progress has been painfully

---

**7.** The importance of having elected officials and candidates come from the various minority communities is obvious. It enhances minority turnout at the polls, provides credible minority leadership to which all leaders can turn, aids minorities in obtaining the benefits of patronage, government contracts and public services, assures that our elected officials come from the pool of all qualified individuals, and legitimates all political activity—popular and unpopular—by promoting the appearance of community representation.

slow, in part because of the intransigence of state and local officials and repeated delays in the judicial process.

\* \* \* \* \* \*

Article I, section 2, and the 17th amendment to the Constitution permit the right of the States to fix the qualification for voting. However, the 15th amendment outlaws voting discrimination, whether accomplished by procedural or substantive means.

\* \* \* \* \* \*

Thus, so long as State laws or practices erecting voting qualifications do not run afoul the 15th amendment or other provisions of the Constitution, they stand undisturbed. But when State power is abused, it is subject to Federal action by Congress as well as by the courts under the 15th amendment.

\* \* \* \* \* \*

There can be no doubt about the present need for Federal legislation to correct widespread violations of the 15th amendment. The prevailing conditions in those areas where the bill will operate *offer ample justification for congressional action because there is little basis for supposing that the States and subdivisions affected will themselves remedy the present situation* in view of the history of the adoption and administration of the several tests and devices reached by the bill.

The choice of the means to solve a problem within the legitimate concern of the Congress is largely a legislative question.

H.R.Rep. No. 439, 89th Cong., 1st Sess. *reprinted in* 1965 U.S.CODE CONG. &

ADMIN.NEWS 2437, 2440–2441, 2449–2450 (emphasis added).[8]

As a result of its reliance on federalism, the majority has turned the separation of powers aspect of standing on its head. Roberts is not a "black person in Hawaii" challenging an election "in Maine." *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984) (per O'Connor, J.). Rather, he is a black candidate from St. Louis challenging an election in the City of St. Louis. He was personally injured by the appellants' alleged violation of federal law. Congress granted persons in Roberts' position specific remedies. Yet, by interpreting the Act without regard to the Act's language, general purpose or legislative history, the majority uses federalism as a vehicle for thwarting congressional will.[9]

## II. THE MERITS

Because I would hold that Roberts does indeed have standing, I find it necessary to discuss the merits of Roberts' claims. Upon review of the merits, I would affirm the district court for the following reasons.

First, the district court correctly held that the "central inquiry in, and the essence of, a challenge to an electoral structure or practice under [section] 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973, is whether, as a result of the challenged practice or structure, a protected group does not have an equal opportunity to participate in the political process and to elect candidates of that group's choice." *Roberts,* 679 F.Supp. at 1529 (citing *Thornburg v. Gingles,* 478 U.S. 30, 63, 106 S.Ct. 2752, 2772, 92 L.Ed.2d 25 (1986)). Any

**8.** Senator Hruska, who voted for the 1965 Act but not the 1975 extension, commented that they were a departure

> from the general rules of good legislation in that they produced a troublesome precedent of Federal interference in State matters. This departure was tolerated by this Senator, and by at least some others in this body, in the belief that the discrimination which existed at that time was of the proportion that serious remedies were required.

S.Rep. No. 295, 94th Cong., 1st Sess., 70 *reprinted in* 1975 U.S. CODE CONG. & ADMIN.NEWS

774, 820 (minority view of Senator Roman L. Hruska to S. 1279).

**9.** The majority's use of standing may be an attempt to disguise a surreptitious ruling on the merits. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 490, 102 S.Ct. 752, 768, 70 L.Ed.2d 700 (1982) (Brennan, J., joined by Marshall, J., and Blackmun, J., dissenting) ("The opinion of the Court is a stark example of this unfortunate trend of resolving cases at the 'threshold' while obscuring the nature of the underlying rights and interests at stake.").

effort to establish the sociological causes for the phenomenon of over- and undervoting in the punch card voting system is as irrelevant to this case as was the effort by appellants in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), to have the Supreme Court adopt a definition of racially polarized voting that centered on a showing that voting patterns are determined primarily by the voters' race. Correlation, and not causation, is the relevant inquiry, *id.* at 63, 106 S.Ct. at 2772 (Brennan, J., joined by Marhsall, Blackmun, and Stevens, JJ., writing for the Court), and there is substantial evidence of a correlation between the punch card voting system as used in St. Louis and blacks having less opportunity than other members of St. Louis' electorate to participate in the political process and to elect representatives of their choice. *Roberts,* 679 F.Supp. at 1518–19.

Second, the district court's finding that minority candidates for citywide public office in St. Louis have only had sporadic electoral success is supported by substantial evidence. Blacks in St. Louis have never been able to elect a black mayor, and the only black President of the Board of Aldermen was appointed to office. The fact that a white candidate, who enjoyed significant support among blacks, won election for mayor does not preclude a finding of only sporadic success. Moreover, sporadic electoral success does not foreclose a claim under the Voting Rights Act. *See Thornburg,* 478 U.S. at 76, 106 S.Ct. at 2779 ("Nothing in the statute or its legislative history prohibited the court from viewing with some caution black candidates' success in the 1982 election, and from deciding on the basis of all the relevant circumstances to accord greater weight to blacks' relative lack of success over the course of several recent elections. Consequently, we hold that the district court did not err, as a matter of law, in refusing to treat the fact that some black candidates have succeeded as dispositive of appellees' § 2 claim.").

Third, the district court correctly concluded that the section 2 preconditions to suit existed. First, the court's finding that blacks in St. Louis have the *potential* to elect a candidate of their choice for citywide election is supported by substantial evidence. To require Roberts to prove that the percentage of blacks living in St. Louis is high enough to necessarily control the outcome of all citywide elections is not consistent with *Thornburg. Id.* at 50 n. 17, 106 S.Ct. at 2766 n. 17. ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.") (emphasis in original). Moreover, it is not consistent with the predominant purpose of the Voting Rights Act to enforce the right to vote of any person regardless of race or color. H.R.Rep. No. 439, 89th Cong., 1st Sess. *reprinted in* 1965 U.S.CODE CONG. & ADMIN.News 2437, 2437. Thus, the district court did not err when it concluded that it "has not been directed to and is unable to find any cases requiring that the minority population actually constitute a majority in the relevant voting unit." *Roberts,* 679 F.Supp. at 1530. Furthermore, there is no doubt that substantial evidence supports the trial court's finding that legally significant, racially polarized voting exists in St. Louis.

Fourth, considering the totality of the circumstances, the challenged practices resulted in a significant disenfranchisement of black voters. Initially, black citizens of St. Louis presently bear the effects of a pervasive history of official discrimination in St. Louis. For a detailed discussion of official discrimination in St. Louis and throughout the Eighth Circuit states, see Heaney, *Busing, Timetables, Goals, and Ratios: Touchstones of Equal Opportunity,* 69 Minn.L.Rev. 735, 736–64 (1985). The City has authorized extensive racial segregation in land use and public accommodations. The St. Louis public schools have a long history of segregation and are presently operating under a desegregation plan ordered by this Court. Official discrimination has resulted in almost three times as many black households as white households having incomes below the poverty level and an unemployment rate for blacks

630

nearly three times higher than for whites. Secondly, as noted above, St. Louis has a substantial history of racially polarized voting, and its blacks have the potential to elect candidates of their choice to citywide office. Moreover, the campaign in question exhibited substantial overt and subtle racial appeals. *Roberts*, 679 F.Supp. at 1515. And most importantly, votes cast in "black" wards were much more likely not to be counted than those in "white" wards during the election in question, as well as four previous elections. Finally, the appellants' justification for not manually recounting discarded ballots—administrative convenience—is tenuous. These circumstances firmly establish that the political process leading to the election of candidates for public office in the City of St. Louis is not equally open to its black citizens as to the rest of its electorate.[10]

---

**10.** The appellants raise several other questions on appeal: whether the district court erred in failing to abstain from exercising jurisdiction over Roberts' Voting Rights Act claim, whether the district court erred by granting relief even though Roberts failed to seek a timely pre-election determination of his claim, whether the district court was clearly erroneous in finding that the campaign in question was characterized by overt racial appeals, and whether the district court erred in granting a remedy that required the appellants to manually recount all ballots containing an over- or undervote. I find appellants' remaining questions to be without merit.